UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FLORIDA WILDLIFE FEDERATION,
et al.,

      Plaintiffs,

v.                                CASE NO. 8:14-cv-3204-T-23JSS

GINA MCCARTHY, et al.,

      Defendants.

_____/

## ORDER

      Section 303(d) of the Clean Water Act imposes on the EPA a duty to approve

or reject a state's list of "impaired waters."  From May 2012 to April 2014, the

Florida Department of Environmental Protection (FDEP) updated Florida's list of

impaired waters.  In September 2014, the EPA issued a "decision document," which

partially approved the list.

      Florida Wildlife Federation and Cindy Davis sue (Doc. 68) under Section

706(2)(A) of the Administrative Procedure Act.  In Count I, the plaintiffs allege that

the EPA failed to correctly evaluate Florida's antidegradation requirements.  In

Count III, the plaintiffs allege that the EPA erroneously denied petitions for a

rulemaking to revise Florida's antidegradation policy.  No other claims remain.

      A May 8, 2015 order (Doc. 38) grants the intervention of FDEP, the State of

Florida, and the Florida Department of Agriculture and Consumer Services

(collectively, the intervenors).  The plaintiffs, the EPA, and the intervenors move

(Doc. 77, 79, 80) for summary judgment.  The Fertilizer Institute files an amicus

brief.  (Doc. 83)

## STANDARD

Section 704 of the Administrative Procedure Act authorizes judicial review of

a "final agency action for which there is no other adequate remedy in a court[.]"  The

EPA's denial of the petitions for rulemaking represents a final agency action.  *Fox*

*Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1037 (D.C. Cir. 2002).  And no party

disputes that the EPA's partial approval of Florida's impaired waters list marks "the

consummation of the agency's decisionmaking process . . . from which legal

consequences will flow," including the development of pollution controls for the

listed waters.  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016)

(internal quotation marks omitted); *e.g., Sierra Club, Inc. v. Leavitt*, 488 F.3d 904 (11th

Cir. 2007) (reviewing the EPA's partial approval of an impaired waters list).

Section 706(2)(A) authorizes a reviewing court to "hold unlawful and set aside

agency action, findings, and conclusions found to be . . . arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law[.]"  Under this highly

deferential standard, a court may not substitute its "judgment for that of the agency

as long as the agency's conclusions are rational and reasonably explained."  *Black*

*Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1285 (11th Cir.

2016).  The agency's judgment prevails unless (1) "the decision does not rely on the

factors that Congress intended the agency to consider," (2) "the agency failed entirely to consider an important aspect of the problem," (3) "the agency offers an explanation which runs counter to the evidence," or (4) "the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise."[1] *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002).

## DISCUSSION

## Impaired Waters List (Count I)

Under 40 C.F.R. § 130.7(b)(1), a state must identify waters for which pollution controls "are not stringent enough to implement" the state's "water quality standards." Listed waters are targeted for additional pollution control. *Leavitt*, 488 F.3d at 908 n.1.

Subsection 130.7(b)(3) states that "water quality standards" include "numeric criteria, narrative criteria, waterbody uses, and antidegradation requirements." In Count I, the plaintiffs allege that the decision document fails to correctly evaluate Florida's "antidegradation requirements."[2] Although the plaintiffs plead eleven

---

[1] The plaintiffs cite Section 706(2)(E) in the motion for summary judgment (Doc. 77 at 4), but not in the complaint (Doc. 68). Section 706(2)(E) allows a court to vacate agency action that is "unsupported by substantial evidence." Even if the issue is properly pleaded, the plaintiffs identify no infirmities in the EPA's factual findings.

[2] Under a July 2014 settlement agreement, the EPA agrees to "consider all applicable State water quality standards, including antidegradation requirements" when reviewing the impaired waters list. (Case No. 8:13-cv-2084, Doc. 47-1 at 4) As a result, no occasion exists to address The Fertilizer Institute's argument that the Clean Water Act imposes "no basis or requirement . . . to consider antidegradation" when the EPA reviews an impaired waters list. (Doc. 83 at 7)

issues within Count I (Doc. 68 at ¶¶ 102-181), the issues are more efficiently covered in three sections below.

### 1. High quality waters

Florida's antidegradation policy creates special protection for high quality waters, which are known as "Tier 2" waters.  Rule 62-302.300(17), Florida Administrative Code, permits the degradation of Tier 2 waters (that is, the lowering of water quality) only if degradation is "clearly in the public interest."

The decision document explains that the public-interest test "must be applied during the permitting process for any new or expanded discharge that will reduce the quality of receiving Tier 2 waters."  (Doc. 80-1 at 72–73)  FDEP balances "the importance and benefits of the project against adverse impacts caused by the discharge, as well as an options review to demonstrate whether certain alternatives that would minimize lowering of water quality are technologically or economically feasible."  (Doc. 80-1 at 73); *see* Fla. Admin. Code R. 62-4.242(1)(b)

The decision document observes that Florida affords extra protection to "Outstanding Florida Waters," which are known as "Tier 2.5" waters.  (Doc. 80-1 at 72–73); *see* Fla. Admin. Code R. 62-302.700(1) and (9).  Rule 62-4.242(2), Florida Administrative Code, states that a permit applicant must demonstrate that the "existing ambient water quality . . . will not be lowered as a result of the proposed activity or discharge[.]"  The "existing ambient water quality" means the water

quality in 1979.  *United States v. S. Fla. Water Mgmt. Dist.*, 922 F.2d 704, 708 n.5 (11th Cir. 1991).

The decision document finds that "any lowering of water quality associated with permits that was authorized in accordance with the State's required antidegradation process does not require section 303(d) listing."  (Doc. 80-1 at 73)  The decision document concludes "that the State has successfully assessed its waterbodies for attainment of the state antidegradation policy, by confirming that the state permitting program appropriately implemented Florida's antidegradation policy."  (Doc. 80-1 at 73)  In particular, "FDEP provided assurance to the EPA that no permits have been identified that were not subject to antidegradation review." (Doc. 80-1 at 73)

Notably, the plaintiffs raise no objection to the EPA's determination that permitted degradation of a water "does not require section 303(d) listing."  The plaintiffs instead contest the EPA's finding that "no permits have been identified that were not subject to antidegradation review."  Specifically, the plaintiffs argue that FDEP failed to establish the existing ambient water quality for Tier 2.5 waters and that FDEP failed to conduct antidegradation reviews for water transfers and other activities.

*Existing ambient water quality*

Citing Florida's regulatory scheme, the intervenors vigorously argue that a permit applicant, not FDEP, must establish existing ambient water quality.

- 5 -

However, the EPA disclaims any obligation to examine the merits of permit decisions when the EPA reviews an impaired waters list.  As explained below, the EPA's interpretation is reasonable.

Section 303(d)(2) allows the EPA thirty days to approve or disapprove an impaired waters list, but imposes no other restrictions on the EPA's authority.  The implementing regulation, 40 C.F.R. § 130.7, introduces some additional limits. Under 40 C.F.R. § 130.7(d)(2), the EPA may only approve a list "if it meets the requirements of § 130.7(b)," which requires a state to submit, among other things, a "description" of the data on which the state relied and a "description" of the state's methodology.  Because a state submits only limited information to the EPA and because the EPA promptly acts on that information, the EPA's role in reviewing an impaired waters list is properly characterized as one of "oversight." *Barnum Timber Co. v. EPA*, 835 F. Supp. 2d 773, 780-82 (N.D. Cal. 2011).

Of course, the EPA can request additional information, 40 C.F.R. § 130.7(b)(6)(iv), and the EPA can independently evaluate information.  But Tier 2 antidegradation requirements differ from the other water quality standards (numerical criteria, narrative criteria, and waterbody uses) assessed during the listing process because Tier 2 requirements do not describe the condition of a water as a whole.  Rather, Florida's Tier 2 balancing test applies only to an individual permit application.  If the EPA independently evaluates Tier 2 requirements, the EPA effectively reviews FDEP's permit decisions.

The EPA points out that Florida provides the plaintiffs with a procedure to object to permits.  Rule 62-620.555, Florida Administrative Code, states that "any interested person may submit written comments on [a] draft permit or may request a public meeting," and Section 120.569, Florida Statutes, states that a person may appeal a permit decision that affects the person's "substantial interests."  By demanding that the EPA review permit decisions, the plaintiffs improperly seek to expand the EPA's limited role.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (explaining that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes.").

The plaintiffs offer no competing analysis of Section 130.7(b), and the plaintiffs fail to explain why the EPA's interpretation is not entitled to deference. *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166–67 (2012).  The plaintiffs instead rely on two state-court decisions, neither of which addresses the EPA's review of an impaired waters list.  *Save Anna Maria, Inc. v. Dep't of Transp.,* 700 So. 2d 113 (Fla. 2d DCA 1997); *DeCarion v. Dep't of Envtl. Regulation*, 445 So. 2d 619 (Fla. 1st DCA 1984).[3]

---

[3] The decisions possess marginal relevance to this action — the decisions assume, consistent with the intervenors' argument, that a permit applicant (not FDEP) must establish existing ambient water quality. *Save Anna Maria, Inc.,* 700 So. 2d at 117; *DeCarion*, 445 So. 2d at 621.

With the exception of the issues discussed below, the plaintiffs cite no record evidence to undermine the EPA's finding that "no permits have been identified that were not subject to antidegradation review." (Doc. 80-1 at 73)  The EPA is therefore entitled to rely on FDEP's verification that all permits received an antidegradation review.  *Bluewater Network v. EPA*, 370 F.3d 1, 15 (D.C. Cir. 2004); *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 844 n.11 (5th Cir. 2003).

*No antidegradation reviews*

The plaintiffs contend that FDEP failed to conduct any antidegradation review for water transfers, non-point source discharges, best management practices, consumptive use permits, and activities evaluated under Rule 62-25.025, Florida Administrative Code.  But the plaintiffs cite no provision under federal law or under Florida law that subjects these activities to an antidegradation review.  *See, e.g., Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1227 (11th Cir. 2009) (explaining that non-point sources are not covered by the Clean Water Act's permitting scheme); 40 C.F.R. § 122.3(i) (excluding water transfers from the Clean Water Act's permitting scheme).

The plaintiffs' real quarrel lies with the scope of Florida's antidegradation policy.  The plaintiffs concede (Doc. 77 at 18) that the EPA approved Florida's antidegradation policy in 1989.  For the same reason that the EPA can rely on FDEP's permit decisions when the EPA reviews an impaired waters list, the EPA can rely on Florida's EPA-approved antidegradation policy.  *See Thomas v. Jackson*,

- 8 -

581 F.3d 658, 664 (8th Cir. 2009) (holding that the EPA was reasonable in relying

on EPA-approved water quality standards when reviewing an impaired waters list).

The plaintiffs raise two arguments specific to municipal separate storm sewer

system (MS4) permits.  The decision document observes that MS4 permits received

no antidegradation reviews before September 15, 2010, because FDEP's "position

was that MS4 permits did not cause degradation of waters but rather that such

permits reduced the degradation that would result from unregulated storm water

discharges to State waters."  (Doc. 80-1 at 73)  The decision document finds that

since September 15, 2010, "all new or expanded MS4 permits have been subject to

antidegradation analysis[.]"[4]  (Doc. 80-1 at 73)

The plaintiffs argue that FDEP's failure to conduct antidegradation reviews for

MS4 permits before September 2010, undermines the EPA's finding that "no permits

have been identified that were not subject to an antidegradation review."  (Doc. 80-1

at 73)   But the decision document explains that the EPA applies "the State's

reasonable interpretations of [water quality] standards."  (Doc. 80-1 at 72)  The

plaintiffs advance no challenge to the FDEP's initial interpretation "that MS4

permits did not cause degradation of waters."  (Doc. 80-1 at 73)

---

[4] Belatedly, the EPA asserts that all MS4 permits, including the permits issued before
September 2010, received an antidegradation review upon renewal. (Doc. 85 at 10, Doc. 80 at 19
n.16) The decision document contains no such finding.  A court cannot "supply a reasoned basis for
the agency's action that the agency itself has not given." *Black Warrior Riverkeeper, Inc.*, 833 F.3d at
1285 (internal quotation marks and citation omitted).

The plaintiffs alternatively argue that by acknowledging FDEP's altered position on MS4 permits, the EPA improperly approves a "non-rule" change to Florida's antidegradation policy.  A February 2, 2016 order (Doc. 67 at 2–3) denies the plaintiffs' request to challenge the EPA's "non-rule" approval of Florida's antidegradation policy.  But even indulging this argument, the plaintiffs still lose because the decision document, which contains no "non-rule" approval, merely recounts FDEP's interpretation of Florida's antidegradation policy.

## 2. Existing uses

Besides forbidding degradation of high quality waters, Rule 62-302.300(14), Florida Administrative Code, ensures no degradation below the existing use of waters that currently meet an existing use ("Tier 1" waters).  Rule 62-302.200(14) states that "existing use" means "any actual beneficial use of the waterbody on or after November 28, 1975."

The decision document recommends the addition of seven waters to the impaired waters list because each of the seven fails to attain the designated use (and existing use) of "shellfish harvesting."  (Doc. 80-1 at 72)  Although the plaintiffs raise a general challenge to the EPA's evaluation of shellfish harvesting, the decision document demonstrates that the EPA considered the same information on which the plaintiffs rely: historical shellfishing maps and shellfish classification standards. (Doc. 80-1 at 70–72)  The plaintiffs identify no specific evidence in the administrative record that the EPA overlooked or that conflicts with the EPA's findings.

- 10 -

In a similarly conclusory fashion, the plaintiffs argue that the EPA failed to properly assess the existing use of "fishing" for waters in the Everglades.  As the EPA responds (Doc. 85 at 11), FDEP listed each of the forty-one waters in the Everglades. (*See* Doc. 85-1 at 2–4)  Again, the plaintiffs fail to explain how the decision document contradicts evidence in the administrative record.

### 3. Clam Bayou

In a final challenge, the plaintiffs argue that the decision document neglects to "discuss or analyze" an antidegradation study of Clam Bayou in Pinellas County. (Doc. 77 at 20)

By a letter on September 30, 2014, the same day the decision document issued, the EPA addresses the study and explains that the study relied on data collected between July and November 2011, a period outside the "verified period" for the impaired waters list (January 1, 2004 to June 30, 2011).  (Doc. 37-2 at 5)  The EPA further explains that a state "may set a reasonable 'cut-off' date, after which no additional data or information will be considered in the preparation of the draft section 303(d) list."  (Doc. 37-2 at 5–6 n.3)

The decision document is "properly read together with accompanying explanatory correspondence."  *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004); *Leavitt*, 488 F.3d at 914 n.16.  The plaintiffs raise no objection to the explanation provided in the letter.

**Summary**

To survive a challenge to an agency action as "arbitrary and capricious," an agency must "examine the relevant data and articulate a satisfactory explanation for its action[.]"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The plaintiffs' conclusory and irrelevant arguments, which are consistent throughout this action (*see* Doc. 51 at 3 n.5, Doc. 73 at 7–8), fall distinctly short of discharging their "heavy burden" under Section 706(2)(A).  *Legal Envtl. Assistance Found., Inc. v. EPA*, 276 F.3d 1253, 1265 (11th Cir. 2001) (internal quotation marks omitted).

The plaintiffs' motion for summary judgment on Count I is denied, the EPA's and the intervenors' motions for summary judgment on Count I are granted, and the September 30, 2014 decision document is affirmed.

**Petitions for Rulemaking (Count III)**

Section 303(c)(4)(B) of the Clean Water Act requires the EPA to "promptly prepare and publish proposed regulations setting forth a revised or new water quality standard . . . in any case where the Administrator determines that a revised or new standard is necessary to meet the requirements of this Act."  A person can petition the EPA to determine that a revised standard is necessary — in other words, a person can request a "necessity determination."  *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 231 (5th Cir. 2015).  If the EPA denies the petition, the EPA must

"provide[] an adequate explanation, grounded in the statute" for declining to issue a necessity determination. *Gulf Restoration Network*, 783 F.3d at 243.

After the EPA partially approved the impaired waters list, Davis petitioned the EPA to determine that a revised or new antidegradation standard was necessary.  In July 2015, the EPA denied the petition, along with a similar 2012 petition by Florida Wildlife Federation.  (Doc. 83 at 115–117)  The plaintiffs allege that the EPA failed to provide a reasonable explanation for declining to issue a necessity determination. (Doc. 68 at ¶ 220)

In the July 2015 letter, the EPA explains that the plaintiffs' "requested revisions to Florida's antidegradation requirements would require a level of detail and specificity far beyond what the national regulations require and do not reflect the cooperative federal approach employed by 33 U.S.C. § 1313(c) and the EPA's implementing regulation."  (Doc. 80-3 at 116)  The EPA observes that "States are responsible for reviewing, establishing and revising water quality standards, and the EPA has a review and approval or disapproval role in addition to its authority to make a [necessity determination]."  (Doc. 80-3 at 116)

The EPA further explains that, even if the plaintiffs' "environmental concerns were substantiated," the EPA recently revised the federal antidegradation regulation to require states and tribes "to follow a more structured process when making decisions about preserving high water quality."  (Doc. 80-3 at 116)  Rather than conducting a separate rulemaking for Florida, the EPA elects to expend its "limited

resources" by assisting all states and tribes with the implementation of the new regulation.  (Doc. 80-3 at 116)

The EPA provides an adequate explanation, grounded in the Clean Water Act, for declining to issue a necessity determination.  The EPA prefers national action, rather than the implementation of sweeping changes to Florida's antidegradation policy, a preference consistent with 33 U.S.C. § 1251(b), which emphasizes "the primary responsibilities and rights of States," as well as with 33 U.S.C. § 1313(c), in which "the primacy of the States' role permeates the text." *Gulf Restoration Network v. Jackson*, 2016 WL 7241473, at *5 (E.D. La. Dec. 15, 2016) (holding that the EPA's explanation for declining to issue a necessity determination was grounded in 33 U.S.C. § 1313(c) and 33 U.S.C. § 1251(b)); *see also Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 921 (D.C. Cir. 2008) (deferring to the agency's "policy decision to focus its resources on a comprehensive strategy"); *WildEarth Guardians v. EPA*, 751 F.3d 649, 656 (D.C. Cir. 2014) (recognizing that an agency retains "significant latitude as to the manner, *timing*, content, and coordination of its regulations" (emphasis in original)).

According to the plaintiffs, the EPA "implies" that Florida's antidegradation policy violates the federal antidegradation regulation.  (Doc. 87 at 13)  But the plaintiffs fail to address whether the EPA's explanation is "adequate" and whether the EPA's explanation is "grounded in the statute." *Gulf Restoration Network*, 783 F.3d at 243.  Absent a more focused challenge, the EPA's explanation easily

survives an "extremely limited" and "highly deferential" review. *Massachusetts v. EPA*, 549 U.S. 497, 527–28 (2007); *Gulf Restoration Network*, 783 F.3d at 243.

The plaintiffs' motion for summary judgment on Count III is denied, the EPA's and the intervenors' motions for summary judgment on Count III are granted, and the July 29, 2015 denial letter is affirmed.

## CONCLUSION

The plaintiffs' motion for summary judgment (Doc. 77) is **DENIED**.  The EPA's motion for summary judgment (Doc. 80) is **GRANTED**, and the intervenors' motion for summary judgment (Doc. 79) is **GRANTED**.  The clerk is directed to enter in favor of the EPA and the intervenors a **JUDGMENT** that affirms the EPA's September 30, 2014 decision document and the EPA's July 29, 2015 denial letter. The clerk must deny any pending motion and close the case.

ORDERED in Tampa, Florida, on February 15, 2017.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE